IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2024 Session

**JOHN DAVID SMARTT v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Warren County**
**No. F14190   Larry B. Stanley, Jr., Judge**

_____

**No. M2023-00104-CCA-R3-PC**

_____

Petitioner, John David Smartt, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claims that trial counsel was ineffective by failing to prepare him to testify and failing to object to testimony concerning a recorded phone call between the victim ("J.S.")[1] and Petitioner. Following our review of the entire record, oral arguments, and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and MATTHEW J. WILSON, J., joined.

Christopher Beauchamp (at post-conviction hearing and on appeal) and G. Jeff Cherry (on appeal), Lebanon, Tennessee, for the appellant, John David Smartt.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Chris Stanford, District Attorney General (Assistant District Attorney General at post-conviction hearing), for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Petitioner was indicted for one count of rape (count twelve), five counts of rape of a child (counts one, two, three, six, and nine), three counts of aggravated sexual exploitation of a minor (counts five, eight, and eleven), and three counts of especially aggravated sexual exploitation of a minor (counts four, seven, and ten), for offenses

_____

[1] Because it is the policy of this court to protect the identity of minor victims, we will identify them by their initials.

committed against J.S., beginning when she was four years old and continuing until she was a freshman in high school.

Petitioner's first trial resulted in a mistrial. *State v. Smartt*, No. M2016-01407-CCA-R3-CD, 2017 WL 5462356, at *1 (Tenn. Crim. App. Nov. 14, 2017). Following a second jury trial, Petitioner was convicted as charged on all twelve counts. He was sentenced to an effective 153 years in confinement. *Id.* This court affirmed Petitioner's convictions and sentence on direct appeal. *Id.* The relevant facts presented at trial were that when J.S. was four years old, she was alone with Petitioner in the living room, and Petitioner turned on a pornographic movie. *Id.* She described the movie and testified that Petitioner then took her into his bedroom, placed his penis in her mouth, and told her to "suck on it." Petitioner told J.S. not to tell anyone about the incident. *Id.*

On another occasion, when they lived in "Morrison," Petitioner showed J.S. a sexually explicit home video of her mother showing, among other things, Petitioner and her mother having sex. She only remembered seeing the video one time. *Id.* J.S. did not remember how old she was at the time of the incident, but she estimated that she was eight or nine years old. *Id.* J.S. also described an incident when Petitioner showed her a sexually explicit video on the computer of a "young girl and a man where she was playing to be a young girl." *Id.*

J.S. testified that when she was in kindergarten and living in McMinnville, Petitioner brought her into his bedroom and had her lay on the bed and perform oral sex on him until he ejaculated. *Id.* at *2. J.S. testified that she did not know that Petitioner's behavior was wrong at the time and that Petitioner told her, "that's what daddies do to show their little girls that they love them . . . so I thought that if I did that that he would be nice to me." *Id.* J.S. next described another incident that occurred when she was in kindergarten. Petitioner picked her up from school in the family's minivan, stopped the car, and had her perform oral sex on him. *Id.*

J.S. testified that Petitioner also took photographs of her. He picked her up from basketball camp on one occasion and took her home. *Id.* J.S. testified that Petitioner took her into his bedroom and told her to get undressed, except for her shirt. He then took pictures of her vagina using a digital camera that her mother had purchased for him. *Id.* After J.S. got dressed Petitioner pulled the pictures up on the screen and showed them to her. This embarrassed J.S., and she was concerned that Petitioner would show the photographs to other people. *Id.* She remembered that the incident occurred when she was in fourth or fifth grade because that was when she attended basketball camp. *Id.*

J.S. testified that when she was in fifth grade, she was taken out of class and questioned about her family by an unfamiliar woman. *Id.* The woman asked J.S. if Petitioner had ever harshly disciplined her, whether she had ever seen her parents or siblings without their clothing, and whether she had ever seen a movie that showed people

not wearing clothes.  *Id.*  J.S. denied that any of those things had happened.  She testified, "I didn't know who she was or why she was asking me those questions and my parents had always said, 'what happens under this roof stays under this roof.'"  *Id.*  J.S. further testified that Petitioner imposed "ridiculously horrible punishments for things that shouldn't have been an issue and so I was afraid of telling[.]"  *Id.*

As to count six of the indictment, J.S. testified that she began menstruating when she was twelve years old.  Petitioner told her, "[w]hen you start your period you will be a woman and we can have sex and we can make a baby and he would ask me if I had his baby if he would be the baby's dad or the baby's grandpa[.]"  *Id.* at *3.  Shortly after she started having periods, Petitioner took J.S. into his room and removed all of her clothing.  He attempted to have sexual intercourse with her but she "kept squeezing [her] legs so that [her] body would move as he tried to push forward that [she] would just slide up the bed."  *Id.*  J.S. testified that Petitioner continued attempting to penetrate her vagina with his penis until she "hollered out that it had hurt."  He then told her to go to the bathroom and wash herself out.  *Id.*

Concerning counts seven and eight of the indictment, J.S. testified that Petitioner showed her sexually explicit photographs on his digital camera of her mother in their bedroom.  J.S. described the photographs at trial.  *Id.*  After showing J.S. the photographs, Petitioner told her to remove her clothing and "pose the same way that [her mother] had."  *Id.*  Petitioner then "took the exact same pictures of [her]" with some exceptions.  Petitioner showed J.S. the photographs that he had taken.  *Id.*  J.S. was around thirteen years old at the time of the incident, and unlike when she was younger, she understood that Petitioner's actions were wrong.  She testified, "I wanted him to be nice to me.  I didn't want him to hurt me."  *Id.*

As for count nine of the indictment, J.S. testified that she was nine or ten years old and alone with Petitioner while her brothers were all spending the night with grandparents.  She described the day as an "awful, awful day" because she had to spend the entire day naked.  *Id.*  She said that Petitioner cooked breakfast for them while also naked, and she felt so uncomfortable that she was unable to eat.  *Id.*  J.S. testified while they were in the dining room, Petitioner told her how "sexy" she was and pulled her leg up on his side.  J.S. testified:

I was just a little girl and I was confused really, mainly just confused and disgusted and throughout the day it was just he would - he would put his mouth on my vagina and the very end of the day what finally led him to let me put my clothes back on is he had me give him a blow job and he like ejaculated in my mouth but I wouldn't swallow it and I ran to the bathroom and spit it out and he got mad at me and was telling me that there were thousands of girls in this world that would kill to be in my position and that I should have swallowed it and be grateful for what I had and he let me put

my clothes back on and hooked up the Playstation and just went out in the living room and acted like nothing ever happened when my mom came home.

*Id.*

Concerning counts ten and eleven of the indictment, J.S. testified that on one occasion, when she was eleven or twelve years old, Petitioner recorded a video with his cell phone of her performing oral sex on him. *Id.* at *4. Afterwards, he showed a portion of the video to her. J.S. testified, "I saw my face and I was sucking his penis." *Id.*

As to count twelve of the indictment, J.S. testified that Petitioner had vaginal intercourse with her when she was a freshman in high school. She described the incident as being similar to the first time that Petitioner attempted to have intercourse with her. *Id.* J.S. testified that "it was horrible and painful and I screamed out that it was painful and [ ] he stopped instantly and was telling me that he was sorry and that he didn't mean to hurt me but he had." *Id.*

J.S. first told her older brother about Petitioner's sexual abuse when she was eleven or twelve years old, and they decided to tell their mother. *Id.* They devised a plan whereas J.S. would scream and run away from Petitioner the next time he attempted to abuse her, and they would call her brother's friend to drive them to their mother's workplace. *Id.* J.S. testified, "a couple of days later [Petitioner] pulled me downstairs and he tried to force my hand down his pants and when I yanked away I yelled no and I ran up as fast as I could. We wedged the door. He didn't chase me . . . but we wedged the door anyway[.]" *Id.* She said that they did not have time to call her brother's friend and drive to her mother's workplace before her mother got off work, "[s]o instead we just took the chair away from the door and waited for my mom to come home." *Id.*

That same evening, J.S.'s brother told their mother that Petitioner had been molesting J.S. since she was four years old. *Id.* Their mother left the room and came back with Petitioner. J.S.'s mother told her, "you're going to tell him what you said to me." *Id.* J.S. testified:

I just looked at him dead in the face and I said, I told Mom what you have been doing to me since I was 4 and he is just like licking his lips and he's like, what are you talking about? And I'm like, you know what I was talking about, what you tried to do to me this afternoon. And my mom started crying and he grabbed her and took her downstairs and they were down there for what seemed like forever.

. . .

- 4 -

[I]t kind of went on like pretty much all evening and all night it being that way. My mom would ask me a few questions or something would be said and then he would just take her downstairs and we don't know what was said between that time and nothing was ever told to us later what was said but we went to bed that night and I slept with [my older brother] because I was kind of scared. I just told and like all hell broke loose in the house.

*Id.* The following morning, Petitioner walked into the bedroom with J.S. and her brother and said, "look what you've done to our family." He also told J.S. that she was "tearing [his] marriage apart[.]" *Id.* at *5.

After J.S. told her mother about the abuse, her mother began "asking [her] questions all the time" and remembering things that J.S. had told her. *Id.* They searched for Petitioner's cell phone and "tried to get in the computer but then she told me that he said, sorry and that he is changed and that he will never do it again." *Id.* J.S.'s mother told her that she "needed to forgive" Petitioner and asked her occasionally if "it [was] still going on and it was but I told her no because when I told the one person that I truly trusted that I was ready to tell, it was just blamed on me." *Id.*

J.S. testified that sometime after reporting the abuse to her mother, she was in the bedroom with Petitioner, and he was rubbing her legs because her muscles were sore from sports practice. *Id.* He then pulled off her clothes and digitally penetrated her vagina. J.S. testified that:

[B]ecause there was no lubrication and [Petitioner's] fingernails were long, when he was done he pulled his hand out and there was blood on his hand and under his fingernail and I kind of got freaked out and he told me that it was because his nails were too long and that he was sorry that he scratched me, he wasn't trying to hurt me and I was mortified and just embarrassed and humiliated and physically hurt so I told him like, leave me alone, I didn't want to do it and that was my last recollection of anything. That was the last time.

*Id.*

J.S. testified that she and Petitioner had a physical altercation on February 23, 2013, during which Petitioner attacked her and began punching her. She said that he "banged" her head into the dryer and that "all I was trying to do was get away." *Id.* J.S. testified that she was pulling on the bathroom door and corner of the dryer, and she pulled on the dryer so hard that it lifted up off the floor. *Id.* J.S. said that when she threatened to call police, Petitioner said, "I'm your father, I can do whatever I want." *Id.*

J.S. eventually left the house and moved in with her brother and his wife. *Id.* On May 17, 2013, she reported Petitioner's sexual abuse to her high school resource officer, Deputy Jarvis Johnson. She wanted to report it sooner, but she was afraid. *Id.*

J.S.'s mother married Petitioner in 1994 and worked as a certified nursing assistant. She said that Petitioner stopped working in July 2003 and stayed home with the children while she worked. *Id.* For some time, J.S.'s mother had three jobs and worked long hours. She admitted that Petitioner had taken nude photographs of her using a digital camera and that he made a video recording of her which "probably" showed her having sexual relations with Petitioner. *Id.* That video was the subject of a Department of Children's Services ("DCS") investigation in 2013, when DCS interviewed her. *Id.*

J.S.'s mother testified that when J.S. was twelve years old, J.S. told her that Petitioner had been abusing her. *Id.* at *6. J.S.'s mother then confronted Petitioner and "brought him in the house and [ ] had [J.S. and her brother] tell [Petitioner] exactly what they told [her]." *Id.* When J.S. made the same accusations to Petitioner, J.S.'s mother "started [her] own investigation." *Id.* She searched for photographs of J.S. but did not find any. She continued asking Petitioner about the allegations, but he denied them. *Id.* One of the times she confronted Petitioner, he responded, "I'll say I did it if it will shut you up." *Id.* On one occasion, J.S.'s mother found lotion and a towel out of place, which was consistent with what J.S. told her about Petitioner using lotion to masturbate in front of her. *Id.*

J.S.'s mother agreed that she observed J.S.'s injuries following an altercation between J.S. and Petitioner on February 24, 2013, when she was not home. *Id.* She tried to persuade J.S. to return home from her brother's house after the altercation, but J.S. refused. J.S. told her mother that if she were allowed her to live with her brother and his wife, she would not "bring charges up against [Petitioner]." *Id.*

J.S.'s mother denied destroying any evidence that might have been used against Petitioner at trial. She admitted destroying "an adult toy of [hers] that was not brought up in any of these allegations or any of these charges against [Petitioner]." *Id.* The State offered J.S.'s mother as a hostile witness and questioned her about a journal entry she wrote on August 1, 2013, which read:

> Yesterday I was thinking about all the blessings the Lord has given me in the days before this adversity began and during. I want to write them down so I don't forget. He had me remove something from my home that would have been very embarrassing to me if the sheriff's department would have found them and they would have had to - they would have had [ ] I not listened to the Lord. Two days before this happened [ ]- he had [Petitioner] and I destroy a journal of bad things I had written down about [Petitioner].

. . .

Had it not - had I not done that it would have not been good for [Petitioner] or I.

*Id.* J.S.'s mother testified that Petitioner was with her when she burned the referenced journal. She acknowledged that she wrote another journal entry on January 23, 2014, which read:

I have to go back to June or July of 2007 when [J.S.] first told me about what [Petitioner] was doing to her. Shock, hurt, anger, I felt all those things toward [Petitioner]. I couldn't believe he would do those things. I believed her then. I believe her now.

. . .

[Petitioner] denied it, of course. He said he took pictures and videos of her naked. So I went looking for them. I believed her but I wanted proof. About two weeks after it came to light I told [J.S.] that I still loved [Petitioner]. She said, I know, Mama. I was still looking for proof of what [J.S.] had said even though I believed her. I would still ask [sic] [Petitioner] and he would still deny any wrongdoing. Now this went on and off until the summer of 2012.

*Id.*

On cross-examination, J.S.'s mother testified that she "looked in [Petitioner's] everything, cellphone, computer, this, that, and the other[,]" and she did not find any evidence that Petitioner had abused J.S. *Id.* at *7. She did not contact the police or take J.S. to a doctor because she "wanted to find proof first." *Id.*

J.S.'s older half-brother testified that Petitioner was a "strict disciplinarian" and was physically abusive to him and his siblings. *Id.* He said that on one occasion, Petitioner "slapped [J.S.] so hard that she peed herself and then she was also in trouble for peeing herself." *Id.* He testified that he and his siblings spent a lot of time in his bedroom, and Petitioner frequently called J.S. out of the room. *Id.* He also described a pornographic video of his mother that Petitioner showed him. He was seventeen years old and J.S. was twelve when she told him that Petitioner sexually abused her. *Id.*

J.S.'s half-brother also testified about the plan that he and J.S. devised in which the next time Petitioner attempted to do anything sexual with J.S., he was going to call a friend, "and me and her and the boys could take off running down the road and then my friend would come in his truck to meet us there and then we would get away that way." *Id.* He further testified, "[w]e never actually implemented the plan[;]" however, he encouraged

J.S. to talk to their mother when she got home from work. *Id.* He testified, "Mom got home and [Petitioner] was out in the yard and so I kind of waited a minute trying to give [J.S.] an opportunity to say something to Mom and when she didn't[,] I did." *Id.* He then told his mother that J.S. had something to tell her, and "[J.S.] told Mom that she had been sexually abused since she was four by [Petitioner]." *Id.*

J.S.'s half-brother testified that their mother went outside, brought Petitioner inside, and said, "I want you to say right here in front of him what you just said to me." *Id.* J.S. confronted Petitioner, and Petitioner "led [their mother] downstairs and they started to talk down there for a really undeterminable amount of time on my end, felt like forever. Probably wasn't more than 20 minutes." *Id.* He testified,

> I mean at that point he would come up - they would come up, [J.S.] would provide more details. They would go downstairs, talk some more, come back up, [J.S.] would provide more details, they would go downstairs and then this continued for a few hours.

*Id.*

J.S.'s half-brother graduated high school in 2009 and moved out of the house shortly thereafter. *Id.* at *8. In February 2013, J.S. came to his house, and "was frantic." *Id.* He said that Petitioner "had hurt her," and his wife took photos of J.S.'s injuries. *Id.* He told their mother that he "felt it would be best" if J.S., who was then seventeen, lived with him, and J.S. said that she would not contact police if she was allowed to live there. *Id.* J.S. lived with him until May 2013. His wife convinced J.S. to report the abuse, and she reported it to a school resource officer. *Id.* He denied encouraging J.S. to report the abuse in order to "get out from under [Petitioner's] thumb" because "[i]t wouldn't have been much longer anyway before she would have been out [of Petitioner's house]." *Id.*

On May 17, 2013, Detective Jason Rowland, of the Warren County Sheriff's Department, spoke to J.S. at the school for "probably 30 minutes or something like that." *Id.* He also spoke with J.S.'s half-brother, who was present at the school with J.S. Based on their statements, Detective Rowland obtained a search warrant for Petitioner's home. *Id.*

Before executing the search warrant, Detective Rowland assisted J.S. in placing a phone call to Petitioner, and a listening device and digital recorder was attached to J.S.'s phone. *Id.* Although Detective Rowland was present when J.S. made the call to Petitioner, he only heard J.S.'s side of the conversation, which lasted approximately 30 to 35 minutes. *Id.* He did not hear any of Petitioner's responses to J.S.'s allegations. The recording of the call contained only J.S.'s side of the conversation. *Id.* Detective Rowland testified as follows about the phone call:

[The State]: Was - of course, based on your conversation with [J.S.], did she understand that the purpose of that call was to see if she could engage [Petitioner] in conversation that he would make any admission to her?

[Detective Rowland]: Correct.

[The State]: Did she indicate to you during that conversation that he had, in fact, made admissions?

[Detective Rowland]: That's what she told me.

*Id.* at *9.

A search warrant was executed for Petitioner's home and police found a silver digital camera in Petitioner's bedroom, but the SD card was missing. *Id.* at *8. They also seized Petitioner's computers and sent them to the Tennessee Bureau of Investigation ("TBI") for examination. *Id.* The hard drive was missing from the computer matching the description of Petitioner's computer that J.S. had given Detective Rowland. *Id.*

Based on these facts, Petitioner was convicted of all counts as charged. This court affirmed Petitioner's convictions and sentence on direct appeal. *Smartt*, 2017 WL 5462356, at *15. Petitioner subsequently filed a post-conviction petition alleging that he received ineffective assistance of counsel at trial. More specifically, he asserted that trial counsel rendered deficient performance by: failing to object to Detective Rowland's testimony concerning a recorded phone call between J.S. and Petitioner; failing to "contemporaneously object to inadmissible evidence and testimony during the State's direct examination of [J.S.'s mother];" failing to obtain an expert to analyze and inspect multiple electronic devices seized during the search of Petitioner's home and testified about during trial; and failing to sufficiently prepare Petitioner to testify at trial.

*Post-Conviction Hearing*

At the post-conviction hearing, trial counsel testified that he had been practicing law for seventeen years serving as an assistant district attorney general for six of those years. After that, he was in private practice "almost exclusively" in criminal defense work. Trial counsel testified that Petitioner's first trial ended in a mistrial. When asked if he reevaluated any sort of trial strategy for the second trial, trial counsel said that he "probably did" and that he "would not have gone to trial and tried the case exactly the same way again." He noted that there was nothing "that drastically altered what we believed was a solid defense moving forward in the second trial." However, the State tried the second case differently. Trial counsel agreed that in the second trial, Petitioner's wife, J.S.'s mother, denied keeping a journal. However, the State produced a journal that she identified as belonging to her. The State then had her read portions of it to the jury.

Trial counsel testified that Petitioner did not testify in either the first or second trial. He met with Petitioner more than twenty times, and he "absolutely" prepared Petitioner to testify. Trial counsel said:

I cannot recall specifically from [Petitioner] what we did. But I can tell you what my standard course in all my cases is, and I have no reason to believe that I would've done it differently for [Petitioner]. When I receive discovery initially, there is a period of time that I spend simply reviewing discovery with my client to see how that discovery actually fits within the framework of what you would refer to as theme or theory. Once we establish those, kind of, baselines, I talk to my clients about their right to testify. And as a general rule what I do is role-play. There will be times, because it's been my experience that the average individual who has not been in the criminal justice system has no idea what it is actually like to be examined or cross-examined. I will examine them as though they are my witness, and then I will change roles and I will cross-examine them in a more aggressive stance as I would anticipate the district attorney to do. To give them an idea, as best I can in my office, of what I think they need to anticipate at trial. And I have no reason to think I would not have done that with [Petitioner].

Although trial counsel did not recall a specific meeting with Petitioner about preparing him to testify, he said that prior to both the first and second trials, Petitioner communicated to him on more than one occasion that he did not "feel comfortable expressing himself" or being on the witness stand and letting the prosecutor cross-examine him. Trial counsel testified: "So, [Petitioner] always maintained with me that he did not think that that was something he was going to do. But, we would've discussed it nonetheless." Trial counsel said that he did not prepare an outline for Petitioner of potential questions. He was not aware of any potential impeachment evidence and that Petitioner had no other convictions and had been honorably discharged from the military.

Trial counsel testified that during the course of the first trial, he filed a motion to exclude the audio recording of the phone conversation between J.S. and Petitioner because it only captured her side of the conversation. The trial court held that the recording itself could not be admitted as evidence but testimony concerning any statements that Petitioner made were otherwise admissible as statements against interest. Trial counsel renewed the motion to exclude the recording prior to the second trial, and the trial court "said that it was standing on its previous ruling." It was trial counsel's understanding that "though the recording itself could not come in, testimony about the recording was fair game."

Trial counsel agreed that Detective Rowland testified that he could not hear Petitioner's responses to J.S. during the phone call. He remembered Detective Rowland's testimony that J.S. indicated to him that there was some level of admission by Petitioner.

- 10 -

He did not recall whether he objected to Detective Rowland's testimony, "[b]ut if it's not in the transcript, I did not, no."

On cross-examination, trial counsel agreed that on direct appeal, this court found that Petitioner did not contemporaneously object to Detective Rowland's testimony and, therefore, waived the issue. Trial counsel testified:

> I don't specifically remember not objecting to something or objecting to something. What I can tell you as a general rule, is that at the time of trial when I'm making decisions that are not just law-based, but also strategy-based, that there may be times where a piece of testimony comes in and I choose not to object to it, because I don't want to raise that as kind of a red flag for the jury if it's something that I think we can move beyond. But I don't independently remember whether or not I objected to one thing over another.

When asked if any failure to object in this circumstance might be a strategic decision on his part, trial counsel further testified:

> It very well could be. And in this particular circumstance, [J.S.] would've testified prior to - - I'm sorry, after - - I'm sorry, prior to Jason Rowland. When the testimony had already come in through [J.S.] and Detective Rowland is testifying about the same substance, I can very easily see why I would not necessarily object to that at that point, because it's, A, it's already come in; and, B, it's an issue that I don't necessarily want to draw attention to.

Trial counsel reiterated that he did not clearly recall his exact meetings with Petitioner concerning Petitioner's right to testify and preparations concerning his testimony. However, he was "absolutely" certain that they would have met in preparation for both trials. Trial counsel testified:

> You have to understand, respectfully, that though the issue of a defendant's right to testify or not testify may be, you know, we may try to encapsulate it very simply. Every aspect of a criminal jury trial touches upon whether or not that individual wants to testify, should testify, should not testify. As a trial is approaching and you're looking at the evidence that you know the state is going to put in, it is not simply good enough, in my opinion, to a have a client who can simply say, "nothing happened," because that's not where the questioning will end. The client will have to be able to answer questions from the state about certain pieces of evidence. "Is your daughter lying about this?" "Please explain this." And as I work with a client, going through that

discovery process and we're trying to figure out do you have answers to those questions about whether or not it's a good idea to testify or not.

However, every single client I have, I tell them, your right to testify is one of the rights that I cannot tell you to do it; I cannot tell you not to do it. If you choose to do it, and I don't want you to, I can't stop you. If you choose not to and I think it'd be a really good idea, I can't make you do it. I can only give you the pros and cons. And I would've done that with [Petitioner] as well.

Trial counsel admitted that he had concerns about Petitioner's ability to withstand cross-examination based on his own experiences with Petitioner and concerns that Petitioner expressed to him.

When asked specifically if he advised Petitioner not to testify, trial counsel asserted:

For [Petitioner], especially in the second trial, when the issue of the journal came up, which was a seminal moment in that case for me, because that journal included information that I had never heard before; that I didn't know existed. In fact, I think during the second trial we took a lunch break on one of the days and I came back and made an oral motion to suppress the journal because I didn't want it coming in at that point. When I talked to [Petitioner] standing right over at that end of counsel table before were entered our waivers, I explained to [Petitioner] that the journal was going to be an issue. He was going to be asked about it. And I can tell you, sir, when that occurred during that trial, I leaned over to [Petitioner] and I said, "Why did I not know about this journal?" And [Petitioner's] response to me was, "I thought we burned it." I knew at that point that if [Petitioner] took the witness stand, one of two things was going to happen: He was either going to answer questions in such a way it was going to put me in a position where I could no longer examine him, or he was going to make statements that were going to be damning to him. And I explained those things to him and ultimately he made the decision not to testify.

Petitioner testified that he met with trial counsel less than ten times prior to both the first and second trials and prior to sentencing. He said that they did not discuss his right to testify or his Fifth Amendment right not to testify, and there was no "role-playing" that occurred during their meetings. Petitioner agreed that he told trial counsel that he had difficulty "articulating" his thoughts, and trial counsel prepared Petitioner's mother to testify but not Petitioner. He said that trial counsel met with his mother for approximately one hour in a room using a whiteboard to prepare for her testimony. Petitioner testified that trial counsel's wife was also in the room, and "she was talking about how serious that [trial counsel] took this[.]"

- 12 -

Petitioner remembered being in court during his first and second trials and the trial court asking him about his right to testify. He agreed that the trial court asked him a series of questions and explained his right to testify, and Petitioner ultimately waived that right. When asked why he waived his right to testify, Petitioner testified:

> Well, I hadn't had any experiences speaking publicly, and I didn't really know what kind of questions he would ask, or what to really expect during cross-examination. And one thing I definitely knew was that [the prosecutor] was an experienced lawyer and after watching him cross-examine my wife, it just added to my nerves. And I never testified before so I felt like I was going into a jousting contest without a horse, or going into a sword fight without a sword or a shield. And so, being unprepared, I opted - - I opted just not to testify.

Concerning his February 2013 altercation with J.S., Petitioner would have testified that she was in a small room used as a laundry room/bathroom when she "mouthed off something" as the family was getting ready for church. He said that J.S. became belligerent, and he attempted to slap her mouth. Petitioner claimed that J.S. blocked his hand, and when he tried to slap her again, she ducked hitting her eyebrow on the washing machine. He then attempted to restrain her, and she broke free, hitting one shoulder on the door and the other shoulder on the doorjamb as she left the room. Petitioner testified that J.S. was screaming, obviously distraught, and she ran upstairs. When asked about the recorded phone call with J.S., Petitioner testified:

> I had gotten that phone call in the afternoon after coming home from work and I seen that it was her number on the ID - - on the phone ID - - and I was excited that it was her, because I thought we were finally going to talk this out over where we had that confrontation, I guess you could say, in the bathroom. And then she started making allegations towards me about what this whole thing is about and talking really vulgar. And I asked her, Why are you using that kind of language? What you're saying is not true. And eventually the conversation led to her being at her babysitting job and that she needed to feed the children. And I said, Okay, well you go on and feed those babies and when you get done, call me back so that we can talk some more. And then I went upstairs . . . to eat. And then that's when the sheriff's department came.

Petitioner denied any type of sexual contact with J.S. or that he took nude photographs or videos of her for sexual gratification. Likewise, Petitioner denied showing J.S. or any other children pornographic videos or photographs. However, he agreed that there was an incident prior to the allegations in this case where he and his wife were questioned by DCS about whether Petitioner had shown a pornographic video of his wife to his son. Petitioner

- 13 -

and his wife denied the allegations, and "[t]hat was the end of it." Petitioner said that his son was also in possession of a *Playboy* magazine at school belonging to Petitioner that had been kept under Petitioner's bed.

On cross-examination, Petitioner disagreed with trial counsel's testimony that he prepared Petitioner to testify at trial, and he specifically claimed that trial counsel's testimony was untrue. Petitioner reiterated his grounds for not testifying and said that none of those grounds resulted from advice given to him by trial counsel. He said that he was not under the influence of anything when the trial court questioned him about the waiver of his right to testify, nor was he mentally incompetent. Petitioner asserted that it would have been "beneficial" for him to have testified at trial; however, he would have still had concerns about testifying.

When asked what his testimony at trial would have been concerning J.S.'s mother's journal, Petitioner testified that he knew about it and had seen it. He further testified:

> There was a restraining order for me not to be around my children, but I was at the house when the children weren't there. I wouldn't do it with my children there, absolutely not. But I was there when [J.S.'s mother] was there, and we were talking. She received a phone call, went out on the porch to take the call. I saw the journal on the table, and it's - - I don't know how to - - like I said, articulation is not one of my strong points to get my point across. But, I find it abhorrent to read someone's journal, but I read one of the pages on the journal. And she was expressing that she felt that I did this. When she came back into the house, I asked her about it. Why? Why are you saying these? Why would you think this? And then she said that there was just too many things pointing to it. She believed that I was. And my feelings was hurt, but it was - - I mean, I wasn't going to beat her up. I mean, that's how she felt. And so, I left. I didn't look at the journal and say "Oh, that's incriminating. I need to get rid of that." It was how she felt.

Petitioner testified the journal that had been burned was a different one. He said that J.S.'s mother brought that journal to him and said that it needed to be destroyed. Petitioner testified:

> And I told her, "I want nothing to do with that. That's your journal." She said, "You don't understand. I've called you everything but a white man in this book." And I said, "Okay." And she said, "No. It needs to be destroyed." And I told her, "No, I'm not going to." And she persisted, and I thought here were go. Okay, fine. You know, I didn't want her to peck, peck, peck, peck, you know. I relented it. Now looking back, bad choice. But that's what I did. I helped her.

Following the hearing, the post-conviction court made extensive oral findings and concluded that Petitioner failed to show deficient performance by trial counsel. The trial court later entered a written order in accordance with Tennessee Code Annotated section 40-30-111(b).

**Analysis**

On appeal, Petitioner claims that the post-conviction court erred in denying his petition for relief based on the ineffective assistance of counsel because trial counsel failed to prepare him to testify and failed to object to testimony concerning a recorded phone call between J.S. and Petitioner. The State responds that the post-conviction court properly denied relief on Petitioner's claims because Petitioner "continually expressed" to trial counsel "his disinterest in testifying," and the "record suggests" that trial counsel made a strategic decision not to object to Detective Rowland's testimony about the phone call. We agree with the State.

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Because the right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee, the denial of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act. *See* U.S. CONST. amend. VI; TENN. CONST. art. I, § 9; *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact" that this Court "reviews de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456, n.4 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-

33 (Tenn. 1975). To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 405-06 (2000)).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State*, 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the *fact* of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294 (emphasis in original)); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1).

As to Petitioner's claim that trial counsel failed to prepare him to testify, the post-conviction court in this case found that Petitioner had been questioned under oath "regarding his right to remain silent; his right to testify; that he would be cross-examined; that he would be able to respond to questions by his attorney." The court pointed out that at the time of the second trial, Petitioner had already "seen the whole trial play out" in the first trial. "[T]hen by the time he got the opportunity to testify in the second trial," Petitioner had seen the proof against him and had seen the prosecutor "engage in examining the witnesses." The post-conviction court concluded that by the second trial, Petitioner "generally" knew what he would be asked if he testified. The post-conviction court further found that during both trials the trial court thoroughly and extensively questioned Petitioner about "the implications of his right to remain silent and his right to testify" and that trial counsel adequately advised Petitioner of his rights. The trial court also noted that Petitioner admitted he told trial counsel he could not articulate his thoughts and he did not wish to endure a cross-examination like he had watched his wife endure. Based on the evidence, the post-conviction court concluded that "Petitioner was fully aware of the implications of his decision not to testify, in all respects. As such, any allegations . . . claiming that he did not knowingly or intelligently waive his right to testify at his second jury trial, are found to be wholly without merit."

The record does not preponderate against the post-conviction court's findings. Trial counsel testified that he "absolutely" prepared Petitioner to testify. Although he did not recall specific meetings with Petitioner, trial counsel said that his standard practice in all cases was to review discovery with a defendant "to see how that discovery actually fits within the framework of what you would refer to as theme or theory." Once those baselines were established, trial counsel then talked to his client about the right to testify. Trial counsel further testified that as a general rule, he would "role-play" by examining his

clients as though they were his witness and then change roles and cross-examine them more aggressively as he would anticipate the State would examine them. Trial counsel specifically said: "And I have no reason to think I would not have done that with [Petitioner]."

Trial counsel testified that on more than one occasion prior to both the first and second trials, Petitioner told him that he did not "feel comfortable expressing himself" or being on the witness stand and being cross-examined by the State. Trial counsel further testified that Petitioner "always maintained with me that he did not think that that was something he was going to do. But we would've discussed it nonetheless." Although he claimed that trial counsel did not prepare him to testify, Petitioner admitted at the post-conviction hearing that he told trial counsel that he had difficulty "articulating" his thoughts. He was also present when trial counsel used a whiteboard to prepare Petitioner's mother to testify. Petitioner agreed that during the first and second trials, the trial court asked a series of questions and explained his right to testify. He ultimately waived that right and did not mention anything about feeling unprepared to testify.

We conclude that Petitioner has failed to present clear and convincing evidence of any fact demonstrating that trial counsel was deficient by failing to prepare him to testify. Moreover, he cannot demonstrate prejudice because he has failed to show that the result of his trial would have been different if the jury had heard his version of events and his denial that he sexually assaulted J.S. The jury would have been free to discredit his testimony. We also note that trial counsel was concerned about the journal that was introduced at the second trial, and he told Petitioner he would be questioned about it. Trial counsel testified that he was previously unaware of the journal, and Petitioner indicated that he thought that he and J.S.'s mother had burned it. Trial counsel said: "I knew at that point that if [Petitioner] took the witness stand, one of two things was going to happen: He was either going to answer questions in such a way it was going to put me in a position where I could no longer examine him, or he was going to make statements that were going to be damning to him." Trial counsel explained this to Petitioner, and he chose not to testify. Petitioner is not entitled to relief.

Next, concerning Petitioner's claim that trial counsel was ineffective for failing to object to Detective Rowland's testimony about the phone call between J.S. and Petitioner, the post-conviction court found that trial counsel made a strategic decision not to object to the testimony. The post-conviction court found that "trial counsel timely filed a pre-trial motion to exclude [Detective] Rowland's testimony. The trial court overruled the motion and found that [Detective] Rowland's testimony should be allowed at trial. Accordingly, there was no need or lawful obligation imposed on [trial counsel] to ask the trial court to reconsider its prior ruling." In finding Petitioner's allegation of ineffective assistance to be without merit, the post-conviction court also noted that Detective Rowland's testimony would likely have been admissible through another witness

Again, the record does not preponderate against the trial court's findings. Trial counsel testified that during the first trial, he filed a motion to exclude the audio recording of the phone conversation between J.S. and Petitioner because it captured only J.S.'s side of the conversation. The trial court excluded the recording itself but held that testimony concerning any statements that Petitioner made during the call were otherwise admissible as statements against interest. The motion to exclude was renewed prior to the second trial, and the trial court "said it was standing on its previous ruling." Trial counsel understood that "though the recording itself could not come in, testimony about the recording was fair game." The trial court then allowed Detective Rowland to testify as to J.S.'s comments about Petitioner's admission. At trial, the State asked Detective Rowland if J.S. indicated that Petitioner made an admission during the phone conversation. He responded, "That's what she told me." Trial counsel did not object to this response.

When asked if his failure to object might have been a strategic decision on his part, trial counsel testified that "[i]t very well could be." He further testified that generally when making a decision that is law-based or strategy-based, "there may be times where a piece of testimony comes in and I choose not to object to it, because I don't want to raise that as kind of a red flag for the jury if it's something that I think we can move beyond." In this case, trial counsel pointed out that the testimony concerning Petitioner's admission during the phone call had already been introduced through J.S., and "I could very easily see why I would not necessarily object to that at that point, because it's, A, it's already come in; and B, it's an issue that I don't necessarily want to draw attention to."

We conclude that trial counsel made a strategic decision not to object to Detective Rowland's testimony and that this decision was made with adequate information as a result of trial preparation and will not be second-guessed by this court. *Hellard v. State*, 629 S.W.2d 4, 12 (Tenn. 1982); *Tolliver v. State*, 629 S.W.2d 913, 914 (Tenn. Crim. App. 1981). Trial counsel's performance concerning this issue was not deficient nor can Petitioner show that he was prejudiced. As pointed out by trial counsel, information concerning the phone call had already been introduced through J.S.'s testimony. Petitioner is not entitled to relief.

## CONCLUSION

For the forgoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 18 -